In re Scott Jeffery PATTERSON, and Teresa Marie Patterson, Debtors.

No. 00–15570 EEB.

United States Bankruptcy Court, D. Colorado.

March 28, 2002.

John Turner, Esq., Colorado Springs, CO, for Debtor Teresa M. Patterson.

Robert J. Mack, Esq., Colorado Springs, CO, for the City of Colorado Springs.

## ORDER AVOIDING JUDICIAL LIEN

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion to Avoid Judicial Lien of Memorial Hospital, an agency of the City of Colorado Springs (the "City"), filed by Debtor Teresa M. Patterson, and the

City's Objection thereto. In her Motion, Mrs. Patterson asserts that the homestead exemption statute exempts real property she owns at 109 W. Eaton, Cripple Creek, Colorado (the "W. Eaton home"), and that the City's judicial lien impairs her homestead. In accordance with 11 U.S.C. § 522(f), she seeks to avoid the fixing of this lien. In its defense, the City claims that the Debtors had abandoned the homestead at the time of their bankruptcy filing in May 2000. Mrs. Patterson admits that they were not residing in the W. Eaton home on the petition date. Nevertheless, she disputes: (1) the City's ability to challenge the homestead exemption in this proceeding, because it failed to timely object to the Debtors' exemption; and (2) that she ever had any intent to permanently abandon the homestead.

## I. Factual Background

At the final hearing on this matter, both Debtors testified at length that they had always intended that the W. Eaton home would remain their homestead. The temporary absences from the home were primarily attributable to two factors: (a) the need to live farther away from the husband's ex-spouse during a difficult divorce and custody dispute and (b) to renovate and repair the homestead.

Mrs. Patterson testified that her parents purchased an old Victorian home in Cripple Creek, Colorado, located at 411 E. Eaton (the "E. Eaton residence"). Mrs. Patterson visited this home and decided to purchase one of her own with her former husband. In May, 1997, she left her home and husband in Texas and moved with her two children to live in the W. Eaton home. Her divorce was finalized sometime in 1998 and her ex-spouse transferred to her his interest in this home. During 1997, she moved all of her belongings and household furnishings to the W. Eaton home.

She has enrolled her children in school in Cripple Creek since Fall 1997.

The W. Eaton home is a Victorian home, over 100 years old. Consequently, Mrs. Patterson knew when she purchased it that it would require a great deal of renovation, including new windows to keep out the cold mountain weather in the winters, new drywall, a new porch, refinished floors and much painting. She has received funds from historical societies for some of the costs of renovation. These grants require that the homeowner continue to own the home for a significant period of time or else the homeowner is obligated to repay a portion of the grants. Not only does she have a financial disincentive to sell this home, Mrs. Patterson further testified that she has never intended to sell the home because it is her "dream home." Her new husband, Mr. Patterson, is skilled in this type of renovation and has been doing the work himself.

In August 1997, Mrs. Patterson met Mr. Patterson, a married neighbor with two children of his own. He and his family lived at an undisclosed address that is close enough to the W. Eaton home that the occupants can see into each other's homes and are only a "stone's throw away." Mr. Patterson, not yet divorced, moved in with Mrs. Patterson in March 1998. In April 1998, Mrs. Patterson became pregnant. The baby was born in January 1999 and the couple were married in March 1999.

To say that Mr. Patterson's relationship with his former wife became strained, would be an understatement. They engaged in a bitter custody dispute, and his ex-spouse has even pressed criminal charges against him. Both Mr. and Mrs. Patterson testified that they felt physically threatened and harassed by his ex-wife. Their dog and cat were killed. Pellet shots were fired through their windows.

Tires on their cars were slashed. His adolescent children acquired new guns and on one occasion, Mrs. Patterson recalls that while doing the dishes, a red laser mark appeared on her hand, which she attributed to a gun with a laser scope being pointed at her from the ex-wife's house. Whether the ex-spouse is directly or indirectly responsible for these acts of violence is largely irrelevant. What is relevant is that the Pattersons felt threatened in the W. Eaton home until his ex-wife eventually moved away in June 2001.

To escape the close proximity, the Debtors periodically vacated the W. Eaton home. The following timetable reflects where Mrs. Patterson resided from May 1997 to the present:

| 5/97—8/98 | W. Eaton home |
| 8/98—3/99 | E. Eaton residence |
| 3/99—6/99 | W. Eaton home |
| 6/99—7/99 | intermittently between W. Eaton home & E. Eaton residence |
| 7/99—6/01 | 125 S. Sixth Street, Victor, Colorado (the "Victor property") |
| 6/01—present | W. Eaton home |

The Debtors testified that the W. Eaton home has continuously held their household furnishings. When they lived temporarily in the E. Eaton residence and the Victor property, these homes were fully furnished. The Pattersons were able to live in the other two homes free of charge in exchange for repair and renovation work on these homes. Mrs. Patterson acquired title to the Victor property in January 2001, in connection with a swap of assets with her former husband, who received a jewelry repair business in exchange. The Debtors further testified that they have maintained mortgage payments, utilities, cable, and telephone service continuously at the W. Eaton home.

The City considers the Debtors' claim that they moved from the W. Eaton home to the E. Eaton residence to avoid physical threats from his ex-wife to be specious. Apparently, the E. Eaton residence is only about fours blocks away and the City could not believe that such a short distance would serve as a deterrent if the ex-spouse was truly intent on harassing them. The Debtors explained, however, that although it was not a great distance, it was enough distance that the ex-wife did not have to see them and cross paths with them each day.

In addition, the Debtors temporarily vacated the W. Eaton home for other reasons. They left during the winter of 1998–1999 because the W. Eaton home had not yet been sufficiently winterized with new windows. With the expected arrival of the baby, they sought warmer quarters. With the advent of spring, they moved back to the W. Eaton home. The following summer, they traveled between the W. Eaton home and E. Eaton residence as necessary when one or the other was undergoing major renovation work. By the summer of 1999, they vacated both homes in favor of the Victor property, for a period of two years, while they continued extensive renovations to both homes.

The City offered no testimony to contradict the Debtors' claim that they never intended to abandon the homestead. Instead the City tendered exhibits which show the Debtors were using other addresses for themselves than the W. Eaton home address. In none of these documents, however, did the Debtors ever represent that the other address was their permanent place of abode or homestead. They simply showed where they were located or wished to be contacted at various times.

In connection with a police investigation of the gun shots to their home in June 1999, the Police Report indicates that Mrs. Patterson stated she had no idea who had committed the acts of vandalism. In his Affidavit, the officer claims that when he looked inside the W. Eaton home in June 1999, he saw "little or no furniture inside

the residence." The officer's Affidavit did not state whether he looked throughout the house, or merely through a window, or whether he viewed the home from the front hallway. More importantly, he did not state whether he observed any renovations underway in the W. Eaton home that might have required moving furniture within the home. The Debtors testified that they moved furniture around inside the home to accommodate their work and that they refinished the floors at some point, which presumably required all the furniture to be moved temporarily.

Finally, the City asserts that, given the periods of time that the Debtors resided outside the W. Eaton home and the fact that they did not move back permanently until June 2001, one year after the bankruptcy filing, it has established conclusively that the Debtors abandoned the homestead. According to the City, the Debtors' contention that they were waiting for the ex-wife to move away at some indefinite future date is too vague to rebut the presumption of abandonment. Mr. Patterson testified, however, that he knew it would not be very long before his wife had to move because she owed several years of back taxes on the home and could not pay them.

The Court found none of the evidence offered by the City to be persuasive on the issue of abandonment. On the other hand, the Court found the testimony of both Debtors to be credible in all pertinent respects. Throughout this bankruptcy, the Debtors have consistently asserted a homestead interest in the W. Eaton home, even though they candidly informed their Chapter 7 trustee at the Section 341 creditors' meeting, that at the time of the bankruptcy filing in May 2000, they were residing in the Victor property. At the time of the bankruptcy filing, the only property that they owned was the W. Eaton home.

The Victor property was not acquired until January 2001. The E. Eaton residence has been owned by Mrs. Patterson's parents at all relevant times.

## II. City Not Time Barred from Objecting to Exemption as a Defense

▬▬ Initially, Mrs. Patterson contends that this Court should not even consider the City's defense, which is based solely on a challenge to the validity of the Debtors' homestead exemption. Since the City failed to timely object to the exemption, the Debtor argues, it cannot do so now. Fed. R. Bankr.P. 4003(b) ("Rule 4003") states that a "party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later." The court may extend the deadline only "if, before the time to object expires, a party in interest files a request for an extension." *Id.* The deadline set forth in this Rule is an absolute bar to challenging the validity of an exemption. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992).

The original matrix of creditors filed in this case listed Memorial Hospital as a creditor and, thus, presumably the Bankruptcy Court Clerk's Notice of the filing of the case was sent to it. This Notice expressly listed a deadline for the filing of any objections to the Debtor's claimed exemptions of thirty days after the June 16, 2000 creditors' meeting. The City did not file a timely objection, nor has it provided any excuse for its failure to do so.

The courts are split on whether the failure to timely object precludes a lien creditor from asserting an objection to the exemption in defense of a lien avoidance motion. The Tenth Circuit has not ruled

on this issue. One line of authority, which precludes the untimely attack on the exemption, is represented by *In re Chinosorn,* 248 B.R. 324 (N.D.Ill.2000). The *Chinosorn* court relied on *Taylor's* strict enforcement of the thirty day deadline, "even if the debtor did not have a colorable basis for claiming the exemption." *Id.* at 326. The *Chinosorn* court believed it was bound by *Taylor's* ruling that "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality." *Id.* at 327 (quoting *Taylor v. Freeland & Kronz,* 503 U.S. at 644, 112 S.Ct. 1644). *See In re Shirel,* 251 B.R. 157 (Bankr.W.D.Okla.2000); *In re Kazi,* 985 F.2d 318 (7th Cir.1993).

Other courts have held that entitlement to an exemption and entitlement to avoid a lien on claimed exempt property involve separate questions. In *In re Thompson,* 263 B.R. 134 (Bankr.W.D.Okla.2001), the court held that the secured creditor's failure to timely object did not preclude it from litigating the merits of the exemption in the context of defending a lien avoidance action. The *Thompson* court noted several different bases on which other courts have ruled similarly. *Id.* at 136–37. Some courts have pointed to the language in 11 U.S.C. § 522(f) ("Section 522(f)") of "would have been entitled" to the exemption as indicative of congressional intent to allow consideration of the validity of the exemption in the context of a lien avoidance action and as indicating that the statute does not automatically allow avoidance, merely because the exemption was established by default under Section 522(*l*). *In re Mohring,* 142 B.R. 389, 394 (Bankr. E.D.Cal.1992). Other courts reach the same result, but focus on the definition of "impairment" under Section 522(f). In *In re Moe,* 179 B.R. 654 (Bankr.D.Mont.1995), the court "held that such definition specifically requires the court to include the amount of the exemption that the debtor *could claim,* as opposed to actually claimed and allowed by default, if there were no liens on the property." *In re Thompson,* 263 B.R. at 137. Another school of thought finds that Sections 522(f) and (*l*) serve different functions. "Exemption under § 522(*l*) quickly determines which property is available for distribution ... to unsecured creditors and which property is available for the 'fresh start' of the debtor. In contrast, § 522(f) extinguishes the property rights of a creditor." *In re Thompson,* 263 B.R. at 137 (quoting *In re Streeper,* 158 B.R. 783, 787 (Bankr.N.D.Iowa 1993)).

Some courts have reasoned that requiring a secured creditor to object to the exemptions when they are first claimed, when it does not know if the debtor will ever challenge its lien rights, will lead to "unnecessary litigation and may hinder the debtor's fresh start." *In re Morgan,* 149 B.R. 147, 152 (9th Cir. BAP 1993). In addition, it upsets the settled expectations of secured creditors that they have the option of not participating in the bankruptcy, even to the point of not filing a proof of claim, because of the general rule that their lien rights will survive the bankruptcy unaffected. *In re Thompson,* 263 B.R. at 137. Most importantly, denying the lien creditor its defense would be tantamount to a denial of due process. The Clerk's Notice that informs all creditors of the bankruptcy filing and of the deadline for objections to exemptions does not specify the exemptions nor does it advise creditors at all about the possibility of lien avoidance motions. " 'At a minimum, due process should require that the lien creditor receive notice (rather than be required to search for it) that the liened property is claimed as exempt before the time to object has expired.' ... Allowing the debtor to rely upon the exemption-by-default of § 522(*l*) to avoid a secured creditor's lien

would amount to a procedural ambush not sanctioned by the Constitution." *In re Morgan,* 149 B.R. at 152 (quoting *In re Smith,* 119 B.R. 757, 760 (Bankr.E.D.Cal. 1990)).

This Court is likewise persuaded that denying a lien creditor the right to defend a lien avoidance motion by challenging the exemption would deny the lien creditor due process. It would also defeat the settled expectations of secured creditors in bankruptcy and foster unnecessary litigation over exemptions. This Court further agrees with the *Streeper* court that these two subsections of the statute serve different functions. In a lien avoidance context, the dispute over exempt proceeds concerns only the lien creditor and the debtor, and not the estate. Thus, if the lien creditor does not timely object to the exemption, but successfully defends against the lien avoidance motion, the entire exemption is not set aside. Only that portion of the exemption that is necessary to satisfy the creditor's lien is affected. The balance of the exempt equity belongs to the debtor, not the estate. A contrary result would be inconsistent with the Supreme Court's holding in *Taylor.* Thus, the goal of Rule 4003 is preserved insofar as the amount of distributions available for the estate's creditors is fixed after the expiration of the Rule's deadline. For these reasons, the Court holds that the City is entitled to defend this lien avoidance action, by challenging the Debtors' exemption.

### III. Debtor Establishes Lack of Intent to Abandon Homestead

In its defense, the City asserts that the Debtors abandoned the W. Eaton home as their homestead because they were no longer living there either at the time the City's lien attached or on the petition date. Colo.Rev.Stat. § 38–41–203 ("Section 203") provides that the home-

stead "shall only be exempt ... while occupied as a home by the owner thereof or his family." Arguably, the plain language of this statute prevents the assertion of the exemption if the debtor has moved from the home. On the other hand, Colo.Rev. Stat. § 38–41–207 ("Section 207") expressly allows the exemption to attach to the non-commingled proceeds from the sale of the home for a period of one year after the sale. If the proceeds are used to acquire another homestead, the exemption will carryover to the new property. If Section 203 was intended to be read narrowly to prevent the claim of exemption if the debtor moves out of the homestead for any purpose, then Section 207 would be contradictory by allowing a debtor to sell the residence without forfeiting his exemption. Thus, Section 203 cannot be interpreted so narrowly.

The Colorado Supreme Court, interpreting a former version of Section 203, found that the "cessation of occupancy may raise a presumption of abandonment which will devolve upon the claimant the duty of overcoming it." *Monte Vista Bank & Trust Co. v. Savage,* 75 Colo. 180, 225 P. 219 (Colo.1924)(quoting THOMPSON ON HOMESTEADS § 284). Evidence of the removal of a family satisfies the objector's prima facie case of abandonment. *Id.* at 183, 225 P. 219. To rebut this presumption, "it must appear that the removal was temporary in nature, made for a specific purpose, with the intention of reoccupying the premises." *Id.* (quoting *Harper v. Forbes,* 15 Cal. 202). A "vague intention to return perhaps at some future time and reside there again will not preserve the claimant's home." *Id.*

In *In re Raymond,* 987 F.2d 675 (10th Cir.1993), the debtors had placed their home for sale shortly before the bankruptcy and the husband and children had already moved to Texas, where the husband

had a new job and had leased a home, with an option to buy. As of the date of the petition, the wife remained in Colorado only to consummate the sale of their homestead and pack the belongings. Despite the fact that the debtors clearly evidenced an intent to permanently reside outside this homestead, the Tenth Circuit nevertheless found that they had demonstrated their intent to remain homeowners, by leasing with an option to buy in Texas. Section 207 allowed them to exempt a portion of the proceeds from the home sale and use them within one year to purchase another home.

■ The Tenth Circuit expressly ruled that Mr. Raymond's prepetition move was not a controlling factor. It relied on *In re Swartzendruber,* 72 B.R. 463 (Bankr. D.Colo.1987), in which the debtors had actually sold the home prepetition. Again, Section 207 allowed the *Swartzendruber* debtors to exempt the sale proceeds. Both of these decisions show that the fact that the debtor lives elsewhere or intends to live elsewhere on the petition date does not conclusively establish the loss of the exemption.

The City relies on *In re Keenan,* 106 B.R. 239 (Bankr.D.Colo.1989), asserting that this decision stands for the proposition that the debtor must be residing at the property on the petition date in order to claim the exemption. In *Keenan,* the debtors decided to move to another city for a new job opportunity. They rented out their home. Subsequently, they decided to move back because the new job had not been satisfactory. The *Keenan* court found that the debtors had intended to permanently abandon the homestead, turning it into a rental property. The court found the requisite intention to abandon, coupled with an act of abandonment. Accordingly, it found the homestead had been abandoned, despite the subsequent change in heart. A judicial lien attached to the

home while it was still a rental property. The court found that the intervening judicial lien attached at a time when the debtors did not meet the requirements of the Colorado Homestead Exemption statute and, thus, the lien rights were superior to any subsequently acquired homestead rights. *See Farrey v. Sanderfoot,* 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991). The fact that they intended to move back at the time this lien attached was insufficient. An intent to occupy does not establish a basis for the exemption.

The *Keenan* decision is predicated on the court's finding that the debtors had intended to permanently abandon the homestead at the time that they rented it to another. Once the exemption was lost, reacquiring it required more than a change of heart. Before they could consummate the change, a judicial lien attached. This Court does not interpret the *Keenan* decision as imposing a blanket requirement that the debtor occupy the home on the petition date or else the exemption is forfeited. If it were to be interpreted in this manner, it would be inconsistent with Section 207 and the *Raymond* decision.

The present case is distinguishable from the *Keenan* case insofar as the Court finds that the Debtors never intended to permanently abandon the W. Eaton home as their homestead, either prior to the time the City's lien attached in March 2000 or as of the petition date. The fact that the Debtors were not residing in the W. Eaton home on the petition date creates a presumption of abandonment, but the Court finds that the Debtors have rebutted this presumption based on their testimony that their absence from the W. Eaton home was temporary and made for the specific purposes of renovating the home and avoiding the close proximity with Mr. Patterson's former spouse. They did not have a vague intent to return "someday." They knew the ex-wife would have to move rela-

tively soon due to the back taxes owed on the home. The renovations would not continue indefinitely, at least not extensive renovations that would require them to live elsewhere. The City would have this Court ignore the fact that, on the petition date, the only home owned by the Debtors was the W. Eaton home. The Victor property was not acquired until 8 months postpetition. The City ignores the fact that these Debtors intermittently moved back into the W. Eaton home, until the cold, the renovations or the ex-wife forced them out again.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS the Motion to Avoid Judicial Lien, in favor of the Debtor Teresa M. Patterson and against the City of Colorado Springs. The transcript of judgment, recorded by the City and/or Memorial Hospital on March 10, 2000, in the original principal amount of $16,443.15 shall be VOID and of no further effect as a lien on the real property owned by Teresa M. Patterson at 109 W. Eaton, Cripple Creek, Colorado.